UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **GRANT A. DAVIS,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 08-cv-2704** |
| | § | |
| **AMPCO SYSTEM PARKING and** | § | |
| **ERNIE KOVACH,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court are Plaintiff's Motion to Compel Discovery (Doc. No. 56), an additional Motion to Compel embedded in Plaintiff's Response to Defendants' Motion for Complete Summary Judgment (Doc. No. 66), Defendants' Motion to Strike the Declaration of Philip Emenogu (Doc. No. 69), Defendants' Motion to Strike Chad Homayun's Declaration (Doc. No. 78), and Defendants' Motion for Complete Summary Judgment (Doc. No. 43). All motions have been fully briefed.

Having considered the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Plaintiff's Motions to Compel should be denied, Defendants' Motion to Strike the Declaration of Philip Emenogu should be denied, Defendants' Motion to Strike Chad Homayun's Declaration should be denied, and Defendants' Motion for Complete Summary Judgment should be granted in part and denied in part.

## I.    BACKGROUND[1]

This case arises from alleged racial discrimination, harassment, and retaliation against Plaintiff Grant A. Davis by his employer, Defendant Ampco System Parking ("Ampco"), and his former supervisor, Defendant Ernie Kovach.   Davis asserts that Defendants were motivated by race when they denied him a promotion and later demoted him, transferred him to a different location, and lowered his compensation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981.   Davis also alleges that during his tenure with Ampco, the company denied him paid vacation, paid him less than other employees in the same position, and subjected him to a hostile work environment because of his race.    Additionally, Davis asserts that Ampco took discriminatory actions against him in retaliation for reporting these violations to the Equal Employment Opportunity Commission ("EEOC").

Ampco provides parking services at various locations throughout the country, such as hospitals, restaurants, and airports.   (Horvath Dep. 8:22-25, 9:1-5, December 4, 2009, Doc. No. 67.)   Davis, a black male, began his employment with Ampco as a valet driver at the Medical Clinic of Houston ("MCH") in 1998.   (Davis Dep. 63:7-13, May 19, 2009, Doc. No. 43-2.)   Davis briefly left to work directly for MCH, but returned to Ampco six months later.   (*Id.* at 82:6-25.)

While working for MCH, Davis was promoted to valet supervisor.   (*Id.* at 63:21-22.)   He worked at various other Ampco sites before eventually being transferred to Ampco's operation at Texas Children's Hospital ("TCH") as a valet captain/supervisor sometime after 2000.   (*Id.* at 76:13-25.)   In that position, Davis oversaw the work of over thirty valets.   Davis's duties required him to ensure proper valet staffing levels, verify

---

[1] Except where noted, the facts contained in this section are not disputed.

that valets were dressed in proper uniform, assist in creating employee schedules, and report problems to his supervisor.  (*Id.* at 78:21-25, 79:1-7.)  While a valet captain/supervisor at TCH, Davis's paychecks were delivered to him at the THC worksite.  (*Id.* at 111:24-25,112:1-4.)  He earned ten dollars per hour, but he did not receive paid vacation while working at TCH.  (*Id.* at 79:11-12, 153:10-25, 154:1-25.)  Davis often worked overtime in his position at TCH.  (*Id.* at 132:12-15.)

At some point in 2006, Davis spoke with Chad Homayun, an Ampco valet supervisor of Lebanese or Persian descent.  (*Id.* at 146:9-25, 147:1-2, 153:2-3, Homayun Decl. ¶ 2, Doc. No. 77-1.)  According to Davis, Homayun revealed that he made more money than Davis and that he received paid vacation.  (Davis Dep. 146:17-19, 153:13-18, 154:8-13.)  At the time of this alleged conversation, Homayun was working at Ampco's Wells Fargo location.  (*Id.* at 156:13-15.)  Homayun subsequently stated that he also received vacation pay while working under Davis as a valet driver at THC.  (Homayun Decl. ¶ ¶ 2-3.)

Over the course of his employment at the TCH location, Davis had several supervisors, including Defendant Kovach.  (Davis Dep. 77:1-23.)  Kovach, a facility manager, arrived at TCH and began supervising Davis in February 2007.  (*Id.* at 142:16-23; Kovach Decl. ¶ 2, Doc. No. 43-4.)  During his first month at TCH, Kovach observed a crock-pot containing food in the cashier's office where Davis worked.  (Kovach Dep. 21:19-25, Aug. 20, 2009, Doc. No. 43-4.)  When Kovach inquired about the crock-pot, Davis admitted to owning it and using it to sell food to people on the concourse.  (*Id.* at 22:2-9.)  Davis acknowledges that, for a period of time, he sold burritos, sandwiches, and barbeque to employees at TCH.  (Davis Dep. 187:14-21.)  Following Davis's admission,

Kovach verbally counseled Davis not to sell food items at TCH because it would expose Ampco to liability.  (Kovach Decl. ¶ 3.)  Kovach also claims to have advised Davis not to sell food on at least one other occasion.  (Kovach Dep. 24:16-25.)  The former Assistant Manager at TCH, Dorothy Agudelo, also instructed Davis not to sell food at TCH.  (Davis Dep. 185:13-15, 190:7-17.)  Following his discovery that Davis was selling food on the premises, Kovach posted a memo on the TCH employee bulletin board expressly prohibiting the sale of food at TCH.  (Kovach Dep. 23:11-205, 24:1-10.)

In addition to being counseled by his supervisors for selling food, Davis alleges that various supervisors harassed him throughout his time at Ampco.  At one point, Davis alleges Agudelo refused to order Davis the company's new uniform even though she ordered them for other employees and Davis informed her he needed one.  (*Id*. at 137:7-25.)  Davis also claims his former supervisor, Julio de Leon, came up to Davis and said: "he would jump on [Davis] like he would jump on other employees."  (*Id*. at 138:10-20.)  Davis further alleges that Kovach once got in is face and said he "bet that don't no other supervisor get up in [Davis's] face like he do."  (*Id*. at 140:18-25.)

In April of 2007, Agudelo resigned, leaving the Assistant Manager of Ampco's TCH facility vacant.  (Kovach Decl. ¶ 4.)  Davis called his supervisor Chris Phillips and expressed interest in the position.  (Davis Dep. 147:6-11.)  Phillips told Davis that he would consider Davis for the promotion.  (*Id*.)  Davis then went on vacation.  When Davis returned, Kovach asked Davis to submit a resume for the position.  (*Id*. at 252:7-25, 253:1-2; Kovach Dep. 56:13-22.)  Davis did not submit a resume allegedly because he possessed insufficient time to prepare one before Ampco announced its selection of Cesar Paisano, a Hispanic male, less than a week later.  (Davis Dep. 253:3-25, 254:1-13.)

4

Ampco claims that it interviewed two employees for the Assistant Manager position: Philip Emenogu (a black male) and Cesar Paisano.  (Kovach Decl. ¶ 5.)  Kovach asserts that Davis needed to submit a resume in order to be considered for the position and that Davis was not interviewed because he did not apply.  (Kovach Dep. 56:13-17.)  Ampco claims that it first offered the position to Emenogu, but that he declined the promotion.  (Kovach Decl. ¶ 5; Horvath Dep. 105:3-5.)  Emenogu, however, disputes that he was ever offered the position of Assistant Manager at TCH.  (Emenogu Decl. ¶ 2, Doc. No. 55).  Allegedly, after Emenogu declined the position, Ampco offered Paisano the promotion to Assistant Manager and Paisano accepted the job.  (Kovach Decl. ¶ 5.)

On May 31, 2007, Raul Diaz, a valet driver at TCH, reported to the Office Manager that he had become ill after drinking an expired Gatorade he purchased from Davis.  (Kovach Dep. 27:16-23.)  After taking a report from Diaz, Kovach spoke to Davis about the allegation.  Kovach regarded Davis's responses to his questions about the incident as evasive, and "felt as though [he] was unable to get a straight answer." (Kovach Decl. ¶ 7.)  According to Kovach, Davis would not answer a direct question about whether he had sold any food items at TCH that day, and instead attempted to change the subject by alleging that, Luis Reyes, a TCH valet, also sold food items on the premises.  (Kovach Decl. ¶ 7.)  Kovach spoke with Reyes and another employee regarding Davis's allegations and concluded that Reyes had not sold food at TCH.  (*Id.* at ¶ 8.)

Kovach claims that, as a result of the Gatorade incident and Davis's evasive responses when questioned about it, Kovach lost confidence in Davis and decided that he could no longer trust Davis as a supervisor.  (*Id.* at ¶ 9.)  The next day, on June 1, 2007,

Kovach demoted Davis to valet and transferred him from TCH to an Ampco facility at St. James condominiums ("St. James").  (Davis Dep. 108:2-12.)  Davis's pay was reduced by one dollar per hour at St. James.  (Kovach Decl. ¶ 9.)

Davis believed that his demotion and transfer were motivated by racial discrimination and not his sale of food.  As a result, on June 13, 2007, Davis filed a charge of racial discrimination in employment with the EEOC, alleging that his pay had been reduced and he had been denied promotion to Assistant Manager because of his race.  (EEOC Form 283, Doc. No. 51-2 at 21-22.)  A few days later, on June 19, 2007, Davis wrote a letter containing similar allegations to Ampco's human resources department.  (Letter from Grant Davis to Human Resources, Doc. No. 51-2 at 17.)

Some time after starting work at St. James, Davis found that his paychecks were not delivered to the site as they had been at TCH.  (Davis Dep. 112:19-25.)  Instead, his paychecks were held at Ampco's office in central Houston.  (*Id.* at 115:6-9.)  According to Ampco, this is standard practice for sites with no on-site manager, and all employees at St. James were expected to pick up their paychecks at the company's office.  (Kovach Decl. ¶ 14.)  Davis claims his day-time work schedule prevented him from travelling to the central Houston office during its hours of operation.  As a result, Davis experienced difficulty obtaining his paychecks in a timely manner.  According to Davis, he was the only employee at the St. James location that worked a shift preventing him from picking up his paychecks.  (Davis Dep. 114:14-21.)  Davis claims he informed his Ampco supervisor that he needed his pay checks delivered onsite because he was unable to pick them up, but Ampco never began delivering them.  (*Id*. at 117:12-18.)  Also while working at St. James, Davis claims his work hours were reduced from 40 per week to 32,

and he was required to work on weekends. (*Id.* at 245-247.)  According to Ampco, the work schedules for valets are determined by its clients, not by Ampco.  (Kovach Decl. ¶ 12.)

On March 3, 2008, Davis filed a second EEOC charge alleging retaliation as a result of his first EEOC charge, and a charge of hostile work environment. (Charge of Discrimination, Doc. No. 51-2 at 20.)  In the second charge, Davis cited, among other things, his reduced hours and inability to get paychecks delivered to his job site as examples of Ampco's retaliatory behavior and the hostile work environment it created. (*Id.*)  In addition to the items listed on the EEOC charge, Davis suggested in his deposition that the harassing behavior of his supervisors had also contributed to a hostile environment.  (Davis Dep. 178-185, 194-247.)  After filing the first EEOC charge, Davis also claims he was shunned in that he was no longer offered opportunities to work extra events.  (Davis Dep. 178:17-22.)

Davis continued to work at Ampco's St. James location until February of 2009, at which time the Ampco's contract with St. James ended.  (Davis Dep. 124:2-3.)  In March 2009, after first being offered a position with Ampco in Houston that paid seven dollars per hour, Davis began working at an Ampco facility in Galveston, Texas, for eight dollars per hour.  (*Id.* at 14-25.)

On June 9, 2008, while still working for Ampco at St. James, Davis filed this action in the 164th District Court of Texas, alleging violations of 42 U.S.C. § 1981 and Chapter 21 of the Texas Labor Code.  (Pl. Original Pet., Doc. No. 1-1 at 8.)  Defendants removed the case to this Court on September 5, 2008. (Notice of Removal, Doc. No. 1.)  After Davis's motion to remand the case was denied, he filed an amended Complaint,

removing all causes of action under the Texas Labor Code, and adding allegations that Defendants' actions violated Title VII in addition to 42 U.S.C. § 1981.  (Pl. First Am. Compl., Doc. No. 22.)[2]  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II.   PRELIMINARY MOTIONS

Before considering the merits of the case, the Court must address several pending discovery and evidentiary motions, the outcome of which affects the summary judgment record.

### A.  Motions to Compel

Plaintiff has filed two Motions to Compel Discovery in this case.  The first was filed on November 18, 2009.  (Doc. No. 56.)  The second was embedded in Plaintiff's Response to Defendants' Motion for Complete Summary Judgment.  (Doc. No. 66.) Discovery in this case closed in September of 2009.  The Court's November 18, 2009 order denied all of Davis's late requests for additional discovery, apart from allowing the deposition of Ampco's corporate representative.  (Doc. No. 57.)  The Court indicated that no other leave with respect to discovery would be granted.  In light of the Court's previous order and the extreme un-timeliness of the request, Davis's Motions to Compel are denied.

### B.  Motion to Strike the Declarations of Philip Emenogu

Defendants have moved to strike the declaration of Philip Emenogu because Davis's response was filed one day late and without attaching the exhibit containing the declaration.  (Doc. No. 69).  Davis, however, did provide notice of the declaration's contents and he filed it shortly thereafter.  Thus, Defendants' motion is hereby denied.  If

---

[2] As Doc. No. 22 is the active complaint in this case, the Court will refer to it as "the Complaint."

Defendants would like a continuance of the trial date as a result of the Court's decision not to strike this evidence, the Court will grant one.

### C. Motion to Strike Chad Homayun's Declaration

Defendants have also moved to strike the declaration of Chad Homayun (Doc. No. 77-1.)   Davis filed his Surreply to Ampco's Motion for Complete Summary Judgment on January 6, 2010.  Chad Homayun's declaration was attached.  This was the first time the declaration appeared in the summary judgment record.  The information contained in the declaration, however, was not a new issue in the case.  Indeed, Ampco had responded to Davis's allegations regarding information Homayun supplied Davis in its original Motion for Complete Summary Judgment.   (Doc. No. 43 at 10-11.) Defendant's motion to strike Homayun's declaration is also hereby denied.  If Defendants would like a continuance of the trial date as a result of the Court's decision not to strike this evidence, the Court will grant one.

## III.     STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  *See* FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).

A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  This Court must view all evidence in the light most favorable to the non-

moving party and draw all reasonable inferences in that party's favor.  *Id.*  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  FED. R. CIV. P. 56(e)(1); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'" (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).  Indeed, to survive a motion for summary judgment that is properly made and supported, the opposing party's response cannot rely merely on allegations or denials in the pleadings, but must point to specific facts showing a genuine issue for trial. *See* FED. R. CIV. P. 56(e)(2).

## IV.   DAVIS'S TITLE VII CLAIMS

### A.  The *McDonnell Douglas* Burden-Shifting Framework

 "Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin."  *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 140 (5th Cir. 1996).[33]  In an employment discrimination case, a plaintiff may prove the existence of intentional discrimination either through direct or circumstantial evidence.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).  Title VII claims lacking direct evidence of discrimination are analyzed according to the burden-shifting framework first established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> *McDonnell Douglas* instructs that the plaintiff must first establish a prima facie case of discrimination.  Once the plaintiff presents a prima facie

---

[33] Davis also asserts causes of action under 42 U.S.C. § 1981.  The standard of proof for Title VII discrimination claims also applies to § 1981 claims.  *Roberson v. Alltel Information Services*, 373 F.3d 647, 650 (5th Cir. 2004) (citing *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 403 n. 2 (5th Cir.1999). Because the same facts underlie both causes of action, Davis's Title VII and § 1981 claims are analyzed concurrently.

case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action.  If the defendant is able to do so, the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely a pretext for discrimination.

*Frank v. Xerox Co.*, 347 F.3d 130, 137 (5th Cir. 2003) (internal citations omitted).

To establish a prima facie case of racial discrimination in employment, an employee must typically demonstrate that "he or she was (1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated."  *Abarca v. Metro. Transit Auth.,* 404 F.3d 938, 941 (5th Cir. 2005) (citing *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001).  Different factual situations, however, may call for alterations to the list of elements needed to make a prima facie showing.  *McDonnell Douglas*, 411 U.S. at 802 n.13.

### B.  Davis's Demotion to Valet Driver and Transfer to St. James

The first three elements of the prima facie case are not disputed with respect to Davis's claim that racial discrimination motivated his demotion from valet captain/supervisor to valet driver and transfer from TCH to St. James.  Davis is a black male, he was otherwise qualified for the position that he sought to retain, and he suffered the adverse employment actions of demotion, transfer, and reduced pay.

To satisfy the fourth element of the prima facie case, Davis points to Luis Reyes, another Ampco employee whom Davis alleges also sold food.  Thus, Davis's prima facie case rests on whether Luis Reyes, a Hispanic male, was similarly situated to Davis.  In order to demonstrate that another employee outside the protected class, but treated more favorably, is similarly situated, a plaintiff must show that the supposed misconduct of both employees was "nearly identical."  *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212,

221 (5th Cir. 2001).  Indeed, the conduct of a comparator "is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer."  *Id.*

In this case, the conduct of Davis and Reyes was far from identical.  With respect to Davis, there is no dispute that he sold both food and drink at TCH.  Kovach observed Davis's crock-pot in the TCH cashier's office, verified that Davis was selling food, and counseled him not to do so.  After Davis had been warned not to sell food by Kovach and Agudelo, Kovach received a report that Davis was again selling food on the premises.  When Kovach questioned Davis about the incident, Kovach received what he perceived to be evasive answers.  After the second incident, Kovach avers that he lost faith in Davis.  The evidence demonstrates that Kovach transferred and demoted Davis because Davis failed to heed his supervisors' warnings and respond directly to questions about his conduct.

Davis argues that Luis Reyes, an Ampco employee of Hispanic descent, is similarly situated because he also sold food and/or drink at TCH, but was treated differently because he was not disciplined.  Reyes, however, cannot serve as a proper comparator for purposes of making out a prima facie case because there is no evidence in the record that Reyes actually sold food or drink, or that Kovach believed Reyes was selling.  Unlike with Davis, Kovach possessed no direct evidence that Reyes sold food at TCH and Reyes denied doing so.  There is no evidence that Kovach had reason to disbelieve Reyes.

Even if there were evidence in the record that Reyes was selling food, the two men are not "nearly identical" because Reyes had never been cited for selling food

previously.  *See Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 261 (5th Cir. 2009) (stating that "[e]ach employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable"); *see also Bouie v. Equistar Chems. LP*, No. 05-20382, 2006 WL 1736557, at *3 (5th Cir. June 22, 2006) (unpublished) (holding that plaintiff failed to meet the "nearly identical" prong of the prima facie case where the plaintiff was discharged for two violations and the comparators who were not fired committed only one violation).

Moreover, even if Kovach had determined that Reyes sold food, Reyes had never received verbal counseling against such behavior.  The fact that, unlike Davis, Reyes had not committed a previous violation and been counseled about it "accounts for the difference in treatment" the two men received.  *See Wallace,* 271 F.3d at 221; *Kelley v. Lockheed Martin Corp.*, No. 02-60135, 2002 WL 31319405 at *2 (5th Cir. Oct. 2, 2002) (unpublished) (holding that employees were not similarly situated, in part, because the retained employee "had not been given the benefit of counseling, as [plaintiff] had been").

Further, Reyes and Davis were arguably not similarly situated at the time of the alleged disparate treatment because they held different positions with Ampco.  Ampco employed Reyes as a valet, while Davis had supervisory responsibilities as a valet captain/supervisor.  *Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 304-305 (5th Cir. 2000) (finding that a different job position was evidence that the employees were not similarly situated).

Therefore, because Davis has failed to identify anyone outside his protected class who was treated more favorably under nearly identical circumstances, he has not

established a prima facie case of race discrimination.  Even assuming *arguendo* that

Davis has made a sufficient prima facie showing, Ampco has provided evidence of a

legitimate non-discriminatory reason for Davis's demotion and transfer: his repeated food

sales and evasive responses.  The "ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the

plaintiff."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citing

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (internal

quotations omitted).  Because Davis has not pointed to any evidence in the record that

would tend to show Ampco's stated reasons were pretextual or that race was a motivating

factor in its decision, he cannot show that Ampco's "proffered explanation is unworthy of

credence."  *Id.* (citing *Burdine*, 450 U.S. at 256).

### C.  Lower Compensation and Denial of Vacation Pay[4]

Davis also alleges that, during his time at TCH, Ampco compensated him at a

lower rate than similarly situated employees outside of his protected class.  He also

contends that Ampco denied him paid vacation available to non-black employees.

Again, the first three elements of the prima facie case are undisputed.  Davis is a

black male, Davis was qualified for his position as a valet captain/supervisor, Davis was

paid less than at least one other Ampco employee in his same position, Chad Homayun,

and Davis did not receive paid vacation that was available to Homayun.  Davis's prima

facie case therefore turns on element four: whether Homayun's circumstances were

nearly identical to Davis's.

---

[4] It seems that Davis presents his lower pay and lack of paid vacation as examples of conduct that go to his hostile environment claim and as a separate disparate treatment claim.  The Court shall first analyze the claims under the disparate treatment framework, and then as part of Davis's hostile environment claim, *infra*.

Both Homayun and Davis were employed as valet supervisors at the time Homayun allegedly informed Davis that Homayun earned a higher hourly rate and received paid vacation.  As Defendants note, however, when this alleged conversation took place, Homayun, worked at the Wells Fargo site, not TCH with Davis.  This fact is significant because Ampco points to summary judgment evidence that hourly pay and vacation pay are a function of an employee's location, and that no employees at THC received vacation pay.  (Kovach Decl. ¶ 13.)  Prior to working at the Wells Fargo location, however, Homayun was employed by Ampco as a valet driver at TCH.  Homayun states in a declaration that he worked at TCH for eight to nine months beginning in 2004 and that he received vacation pay and bonuses during that time.  (Homayun Decl. ¶ 2-3, Doc. No. 77-1.)  Ampco attempts to rebut this evidence with a declaration executed by Deborah Horvath, which states that Homayun never received paid vacation while at TCH.  (Horvath Decl. ¶ 5, Doc. No. 78-1.)  This competing evidence creates a genuine issue of material fact as to whether similarly situated employees outside Davis's class received paid vacation, at least during the time both Davis and Homayun worked at THC.  Homayun's declaration further creates a genuine issue of material fact as to whether Ampco's stated legitimate, non-discriminatory reason for not paying Davis vacation (that he worked at THC where paid vacation was not available) is pretextual.  Indeed, Homayun's declaration directly contradicts Ampco's statement that employees at THC did not receive paid vacation.  Thus, summary judgment must be denied with respect to Davis's disparate treatment claim based on denial of paid vacation.

Homayun's declaration does nothing, however, to rebut Ampco's evidence that hourly pay is a function of location and, therefore, Ampco's motion for summary judgment must be granted with respect to Davis's disparate treatment claim that he was compensated less than non-black employees.

### D.  Ampco's Failure to Promote Davis to Assistant Manager

Davis also alleges that Ampco was motivated by race when it failed to promote him to Assistant Manager in April 2007.  In analyzing an allegation that an employer failed to promote a candidate on the basis of race, the *McDonnell Douglas* prima facie inquiry is slightly modified.  A plaintiff must prove by a preponderance of the evidence that he applied for an available position for which he was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.  *Burdine*, 450 U.S. at 253.  There are various circumstances which may give rise to an inference of discrimination, such as where the position for which the plaintiff was rejected remains open and the employer continues to seek applicants from persons of complainant's qualifications.  *McDonnell Douglas*, 411 U.S. at 802.  The fact that the position was offered to a person outside of the plaintiff's protected class may also give rise to such an inference.  *Bernard v. Gulf Oil Corp.,* 890 F.2d 735, 745 (5th Cir. 1989).

### 1.  Davis's Prima Facie Case

Here, it is undisputed that Davis is member of a protected class, he was minimally qualified for the position, he did not receive the promotion, and Ampco ultimately filled the position with an individual outside of Davis's protected class.  Therefore, the completion of Davis's prima facie case depends on whether Davis applied for the position and, if Davis did apply, whether he was rejected under circumstances which give rise to an inference of discrimination.

Defendants contend that Davis's prima facie case fails for two reasons. First, it argues, Davis has not established that he applied for the position because he did not submit a resume as requested by Kovach, defeating the second element of the prima facie case. Second, Ampco alleges that it first offered the Assistant Manager position to Philip Emenogu, a black male, but that he declined the position. This initial offer of employment to an individual in Davis's protected class, Defendants argue, also defeats Davis's prima facie because it destroys the inference of discrimination.

### a. Assistant Manager Application Process

It is undisputed that Davis learned of the Assistant Manager opening and expressed interest in the position to his supervisor, Chris Phillips, as he had done in order to secure previous promotions at Ampco. Phillips, in turn, told Davis that Davis would be considered for the position. Subsequently, the parties agree that Kovach asked Davis to submit a resume for the position. Kovach claims that he told Davis he needed to submit a resume to be considered, but there is no evidence that Kovach told Davis there was a deadline for submitting a resume. This is significant because Davis claims he was given insufficient time to create and submit a resume before Ampco's selection for Assistant Manager was announced less than a week later.

Moreover, the record reveals that Ampco does internally promote without requiring candidates to submit resumes, even at the managerial level. (Kovach Dep. 56:23-25, 57:1.) Indeed, other Ampco employees, including Kovach himself, obtained promotions through informal hiring procedures that did not require the submission of a resume. (Kovach Dep. 102:14-22.)

There are also inconsistencies in the record as to whether a resume was required for the Assistant Manager position. Indeed, Kovach indicated in his deposition it was

"possible from work experience" to be offered the position without submitting a resume. (*Id.* at 65:20-25, 66:1-10.)   Additionally, after being asked at least eight times in her deposition whether Ampco *required* a resume for the Assistant Manager position, notably, Ampco's corporate representative, Deborah Horvath, refused to respond yes or no; rather, she repeatedly said only that Kovach "collected resumes," or "solicited resumes" from interested parties.  (Horvath Dep. 62-66).  Moreover, there is conflicting evidence about whether Cesar Paisano and/or Philip Enemogu, the two individuals who allegedly interviewed for and were offered the position, actually submitted resumes for consideration.   Kovach's declaration states that he collected "the resumes from all interested parties."  (Kovach Decl. at ¶ 5.)  Yet, in his deposition, Kovach, the person who allegedly solicited resumes and required their submission, stated that he had "no knowledge of" whether Paisano submitted a resume for the position of Assistant Manager.  (Kovach Dep. 65:15-19.)

Importantly, there is also no evidence that the individual who made the hiring decision, Chris Phillips, required candidates to submit resumes for consideration.  In fact, the evidence appears to suggest the opposite.   In his deposition, Kovach disclaimed responsibility for selecting Paisano for Assistant Manager.  Indeed, Kovach asserts that Chris Phillips interviewed the candidates and made the hiring decision and that Kovach merely said "yes or no if [he] was going to be comfortable with [Paisano] and [Kovach] said yes."  (*Id.* at 68:4-25, 69:1.)  Thus, the fact that Kovach asked Davis to submit a resume does not necessarily mean that Phillips, the actual decisionmaker, required one. Indeed, Phillips already told Davis he would be considered for the position without mentioning the need to submit a resume.

Courts have rejected arguments, such as the one Defendants advance here, that a plaintiff's prima facie case is defeated because he did not apply, where there was no formal application process and interest in positions was communicated by word of mouth to the decisionmakers. *Abrams v. Baylor College of Med.*, 581 F. Supp. 1570 (S.D. Tex. 1984), *aff'd in part and rev'd and remanded on other grounds*, 805 F.2d 528 (5th Cir. 1986). Based on the evidence in the record, there is a genuine issue of material fact as to the level of formality of Ampco's process and whether Davis's efforts were sufficient to constitute application for the position.

### b.  Promotion Offer to Emenogu

Before announcing Paisano as its new Assistant Manager, Defedants claims that Phillips interviewed and offered the position to a black candidate, Philip Emenogu. If true, this information could defeat Davis's prima facie case, as a plaintiff must show that he was rejected under circumstances giving rise to an inference of discrimination. Absent other evidence raising such an inference, if Ampco did indeed initially select another black candidate, Davis would have difficulty making this showing. Davis, however, has presented evidence that refutes Defendants' claim. Indeed, Enemogu's declaration states unequivocally that Ampco did not offer him the position of Assistant Manager. This evidence creates a genuine issue of material fact as to whether Davis has completed the final prong of the prima facie case.

### 2.  Ampco's Legitimate, Non-Discriminatory Reason

As discussed *supra* in part IV.A., once a plaintiff makes out a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. *Burdine*, 450 U.S. at 254. The defendant need not

persuade the court that it was actually motivated by the proffered reasons.  *See Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978).  Rather, it is sufficient if the defendant raises a genuine issue of fact as to whether it discriminated against the plaintiff.  To make this showing, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."  *Burdine*, 450 U.S. 248.  A defendant, however, cannot meet its burden merely through statements in an answer to the complaint or by argument of counsel.  *Id.*

In this case, Defendants contend that, even assuming a prima facie case, Davis cannot overcome its proffered legitimate, non-discriminatory reason that it did not promote Davis because he never applied for the position.  As discussed *supra* in part IV.D.1.a, however, there is a genuine issue of material fact as to whether this reason is pretextual.  As such, Davis has met his burden on this issue.

Defendants also argue that summary judgment is warranted because Davis cannot show he was "clearly better qualified" than Paisano, the individual chosen over him for the Assistant Manager position.  Defendants do not articulate, however, any reason they believe Davis is subject to this burden.  Indeed, apart from their argument that Davis did not apply for the position, it is unclear whether Defendants have asserted an alternative legitimate, non-discriminatory reason for its conduct.  Although Ampco's argument seems to assume that it chose Paisano because he was the better candidate, a review of the record reveals no statement by any Ampco representative to that effect.  Defendants are correct that, had they asserted Paisano's relatively superior qualifications as a legitimate, non-discriminatory reason for failing to promote Davis, Davis would then bear the burden of proving the pretextual nature of the Defendant's explanation.  The

burden does not shift to the plaintiff, however, until the defendants "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." Defendants' failure to make this showing is fatal to its motion for summary judgment.

Even assuming that Defendants had presented admissible evidence demonstrating Paisano was chosen because he was better qualified, there are two problems with Defendants' characterization of Davis's burden that warrant discussion.  Ampco cites *Deines v. Tex. Dept. of Protective & Regulatory Servs.*, for the proposition that Davis cannot survive a motion for summary judgment absent evidence that he is clearly better qualified than the employee chosen for the position.  164 F.3d 277 (5th Cir. 1999). Defendants further assert that an applicant is not clearly better qualified "unless disparities in curricula vitae are so apparent as virtually to jump off the page and slap [the court] in the face." *Deines*, 164 F.3d at 280.

The first problem with Ampco's argument is that it suggests Davis can prove pretext *only* by showing he was clearly better qualified than Paisano.  A plaintiff however, is not limited to presenting evidence of a certain type to show that a defendant's legitimate, non-discriminatory reason is pretextual.  Rather, this evidence may take a variety of forms.  *See McDonnell Douglas*, 411 U.S. at 804-805; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578 (1978).   Certainly, a plaintiff may seek to demonstrate, as Davis has attempted to do here, that the defendant's claim to have promoted a better qualified applicant was pretextual by showing that plaintiff was in fact better qualified than the person chosen for the position.  But, in order to survive summary judgment, Davis is not *required* to make such a showing.  *Patterson v. McLean Credit Union*, 491 U.S. 164, 187-188 (1989).

Second, in *Ash v. Tyson Foods, Inc.*, the Supreme Court rejected the precise standard Ampco cites – that disparities in qualifications must virtually "jump off the page" in order to be probative of pretext. 546 U.S. 454, 456-58 (2006). The Court found that "[t]he visual image of words jumping off the page to slap you (presumably a court) in the face is unhelpful and imprecise as the standard for inferring pretext from superior qualifications." *Id.* at 457. Although the Court in *Ash* declined to dictate the precise threshold for inferring pretext, it suggested that it did not disapprove of other formulations articulated by federal courts, including "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Id.* (citing *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004)). It also found "qualifications evidence standing alone may establish pretext where the plaintiff's qualifications are "clearly superior" to those of the selected job applicant, to be a suitable standard, as articulated in *Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003) (internal citations omitted).

Thus, notwithstanding the Supreme Court's rejection of the precise standard applied in *Deines*, if Defendants had presented evidence that they hired Paisano because he was better qualified, and Davis were to rely *solely* on evidence of his superior qualifications to prove pretext, he would have to meet a fairly high burden.

Even assuming Davis faces this high burden, the evidence in the record at least raises a genuine issue of material fact as to whether Davis was clearly better qualified for the job. According to Ampco's corporate representative, Deborah Horvath, the minimum requirements for the Assistant Manager position were a high school diploma and ability

to read, speak, and understand English.  (Horvath Dep., 88:19-23, 89:9-14.)  Horvath also stated that the relevant criteria used to evaluate candidates for the position were education, experience, and tenure, although she admitted that education was not necessarily important.  (*Id*. at 99:1-9.)  Horvath clarified that, for Ampco's purposes, tenure means how long an individual has been with the company, while experience includes an individuals "whole experience in a job function."  (*Id*. at 100: 13-17.)

The evidence shows that Davis was well qualified for the position.  He possessed not only a high school diploma, but a college degree.  (*Id*. at 97:13-15.)  There is also no dispute that Davis is fluent in English.  Moreover, he enjoyed a long tenure with Ampco.  He began working for the company in 1998, roughly nine years before Ampco chose the new Assistant Manager.  Davis was promoted from valet to supervisor while he was still at the MCH site.  Then, Davis began his employment at TCH as a supervisor, which the evidence suggests occurred in 2003.  It is unclear whether Davis was a supervisor for the short time between the MCH and TCH sites; however, altogether he appears to have been a supervisor for at least four and possibly seven or more years.

On the other hand, evidence suggests Paisano possesses a degree in engineering.  Horvath recalled that it was an associate's degree, while Kovach thought it was a bachelor's degree.  (Horvath Dep. 96:11-14; Kovach Dep. 64:2-4).  It is not clear, however, that Ampco possessed information about Paisano's educational background when it made the decision to hire him.  In fact, Kovach stated that he knew of Paisano's educational background because "once [Ampco] had hired him on there, he told [Kovach] he was an engineer.  (Kovach Dep. 68:2-4).  In response to the suggestion that

23

Kovach may have hired Paisano before knowing he was an engineer, Kovach simply reiterated that he did not hire Paisano.  (*Id*. at 68:4-6.)

Based on the record, even if Paisano and Davis possessed similar educational backgrounds, Davis had far more experience and tenure, the more important criteria on which Ampco supposedly based its hiring decision.  Paisano possessed no more than two years of experience with Ampco.  (Horvath Dep. 96:15-22; Kovach Decl. ¶ 5.)  As for Paisano's supervisory experience, Kovach claimed Paisano had two years of supervisory experience with Ampco, while Horvath was not sure whether Paisano served in a supervisory capacity during his roughly two years with Ampco.  (*Id*.)  What is undisputed is that Paisano had never worked at the TCH location before he was promoted to Assistant Manager there, a location where Davis had worked for roughly four years. (Kovach Dep. 64:10-23.)  Finally, there is evidence that Paisano's English skills may have been insufficient to meet Ampco's own language proficiency requirement.  Davis stated that Paisano had very poor English skills and that Paisano would ask Davis to work in the evenings to help with certain situations in which Paisano could not understand the public.  (Davis Dep. 239:18-25, 294:1-5.)

In short, Davis potentially possessed more than seven years of supervisory experience, roughly four years of which were at the exact site of the Assistant Manager opening.  He had a total of nine years of tenure with the company and, at the very least, an educational history roughly equivalent to Paisano's.  Paisano, on the other hand, had only two years of tenure, none of which was at the THC facility, and at most, two years total supervisory experience.  Paisano also had apparently limited English skills. On the basis of these clear disparities in tenure and experience, a rational finder of fact could

find Davis's qualifications clearly superior, and that no reasonable person, in the exercise of impartial judgment, could have chosen Paisano over Davis. Thus, even if Defendants had properly articulated Paisano's superior qualifications as the legitimate, non-discriminatory reason for its failure to promote Davis, there is a genuine issue of material fact as to whether Defendants' offered reason is pretextual. Therefore, summary judgment must be denied.

## V.     HOSTILE WORK ENVIRONMENT

Plaintiff also argues that he was subjected to unwelcome harassment that affected a term, condition, privilege of employment sufficient to indicate a fact issue in Plaintiff's hostile work environment claim.

"To state a hostile work environment claim under Title VII, the plaintiff must show that: (1) the victim belongs to a protected group; (2) the victim was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the victim's employer knew or should have known of the harassment and failed to take prompt remedial action." *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). "For harassment to affect a term, condition, or privilege of employment it must be sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 353 (5th Cir. 2001) (internal quotations omitted).

Davis has alleged that he was subject to "offensive comments," had his work hours reduced, was forced to work on the weekends, was denied a uniform, and had his paychecks delayed. In its Motion for Complete Summary Judgment, Ampco contends that Davis has failed to establish that any of the alleged incidents of harassment were

based on his race, and thus that element three was not met.  (Defs.' Mot. for Summ. J., Doc. No. 43 at 19-21.)  Specifically, Davis admits that the "offensive comments" alleged by Davis were related to his work, not his race.  (Davis Dep. 141:20-24.)  Davis also admits that they did not affect his ability to perform his job, and thus element four is not met either. *Id.*

Davis's Response to the Motion for Complete Summary Judgment fails to address these arguments.  (*See* Pl. Resp., Doc. No. 66 at 27-28.)  Instead, Davis notes that element one is satisfied, because he is black, and then proceeds to restate the allegations from the Complaint, without citing any evidence except Emenogu's Declaration. (*Id.*) Davis's Surreply is similarly lacking. (Doc. 77 at 13-14.)  Emenogu's declaration establishes only Emenogu's unsupported belief that "racism could have been the reason for [Emenogu's] demotion and cut in pay."  (Emenogu Decl. at ¶ 3). Such speculation is not competent summary judgment evidence relevant to Davis's hostile work environment claim.

As a result, the Court finds that Davis has failed to present evidence establishing a genuine issue of material fact regarding his hostile work environment claim. Therefore, Ampco is entitled to summary judgment as to this claim.

## VI.   RETALIATION

Davis also claims that Ampco retaliated against him for reporting the alleged discrimination against him to the EEOC.  The relevant retaliation statute reads as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  A claim of retaliation can also be sustained under 42 U.S.C. § 1981(b).  *Foley v. U. of Houston Sys.*, 355 F.3d 333, 339 (5th Cir. 2002) (collecting case law and legislative reversal).  To establish a claim of retaliation, a plaintiff must show that (1) the plaintiff engaged in activity protected by Title VII, (2) the plaintiff experienced a materially adverse employment action that would have dissuaded a reasonable employee from making or supporting a charge of discrimination, and (3) the employment action was causally related to the protected activity.  *See Pineda v. United Parcel Serv.*, 360 F.3d 483, 487 (5th Cir. 2004) (stating the three elements); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (clarifying the second element).

It is undisputed that Davis filed an EEOC charge and complained internally to Ampco's human resources department.  It is also clear that Davis was transferred and had his pay reduced as noted above.  The parties disagree, however, about the required connection between Davis's making of the EEOC charge and Ampco's adverse employment decisions.

Davis repeatedly states (without citing evidence) that he was moved to Galveston and had his pay reduced "days after" filing the EEOC charge.  This appears to be factually incorrect.  Indeed, Davis admits that he worked at St. James through February 2009 and only moved to the Galveston location after Ampco's operation at St. James closed.  On this record, no rational finder of fact could conclude that Davis's transfer to Galveston was causally related to his EEOC report or his internal report to Ampco.

All of the incidents relevant to Davis's move from TCH to St. James happened *before* the EEOC filing and *before* the internal report to Ampco, so there is no way that they could be causally related to the report. (*See* Davis Dep. 276:9-15.)  The other issues

Davis points to (late paychecks, lower pay, lower hours) either happened before the EEOC filing, or are explained by the location at which Davis was working, and are thus causally unconnected as well.  Indeed, unlike the paid vacation denial at TCH discussed above, no competent summary judgment evidence shows that any term of employment at St. James or Galveston differed among the employees at the site.

As a result, the Court finds that Davis has failed to set out evidence establishing a genuine issue of material fact regarding his retaliation claim. Therefore, Ampco is entitled to summary judgment.

## VII.    CONCLUSION

Plaintiff's Motions to Compel (Doc. Nos. 56, 66) are **DENIED**.

Defendants' Motion to Strike the Declaration of Philip Emenogu (Doc. No. 69) is **DENIED**.

Defendants' Motion to Strike Chad Homayun's Declaration (Doc. No. 78) is **DENIED**.

Defendants' Motion for Complete Summary Judgment (Doc. No. 43) is **GRANTED** with respect to Davis's disparate treatment claims regarding lower compensation and demotion and transfer, as well as Davis's hostile work environment and retaliation claims. In all other respects, Defendants' Motion for Complete Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** this 27th day of September, 2010.

_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE